# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00838-SCT

*S.D.P. AND I.T.A.*

*v.*

*HARRISON COUNTY DEPARTMENT OF CHILD PROTECTION SERVICES, BY MARCUS D. DAVENPORT, AND I.T.A., JR., A MINOR, BY AND THROUGH HIS NEXT FRIEND, MARCUS D. DAVENPORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/21/2023 |
| TRIAL JUDGE: | HON. MICHAEL BRYAN DICKINSON |
| TRIAL COURT ATTORNEYS: | FRANCES PASSMAN YEATTS |
| | DARNELL L. NICOVICH |
| | KIMBERLY MICHELLE HENRY |
| | ANN CLARK LAZZARA |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JENNIFER LOUISE MORGAN |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KRISTI DUNCAN KENNEDY |
| | KIMBERLY MICHELLE HENRY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/21/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. This case comes before the Court on appeal from the Harrison County Youth Court's judgment terminating parental rights regarding a medically fragile child. The parents appeal, asserting insufficient evidence exists to support a finding that they were unfit to care for their minor son.

**FACTS AND PROCEDURAL HISTORY**

¶2. S.D.P. and I.T.A. are the parents of I.T.A. Jr., a minor child born in February 2020. I.T.A. Jr. was eight months old when he was removed from the care of his mother, S.D.P., and placed in the custody of Mississippi Department of Child Protection Services (MDCPS). In October 2020, I.T.A. Jr. was at his maternal grandmother's house in Hattiesburg with S.D.P. present when he fell and suffered a catastrophic brain injury.

¶3. The next day, between 4:00 and 5:00 a.m., I.T.A. Jr. woke up and vomited. He vomited again at 7:00 a.m. Around 10:00 a.m., S.D.P. drove I.T.A. Jr. two hours away to a hospital in Gulfport, where they reside, rather than to a hospital in Hattiesburg, where the injury occurred, because "the hospital he was born at knows his medical history." S.D.P. told the doctors I.T.A. Jr. was throwing up and lethargic but did not report any kind of physical injury. Unfortunately, unbeknownst to S.D.P., I.T.A. Jr.'s vomiting was due to a brain bleed. He sustained numerous injuries and permanent medical conditions, including blindness and deafness. His traumatic brain injury left him a quadriplegic, requiring extensive and constant care.

¶4. There were two possible explanations given for I.T.A. Jr.'s injury according to S.D.P.: either sitting on the floor and falling forward and hitting his head or falling off a bed and hitting his head. S.D.P. was not with him at the moment of his fall, but she relayed what the grandmother had told her happened. I.T.A. Jr.'s treating physicians determined that neither explanation was consistent with I.T.A. Jr.'s injury. The police questioned both parents and the grandmother, but no criminal charges were pursued.

¶5.     On December 2, 2020, the Harrison County Youth Court entered an emergency-custody order removing I.T.A. Jr. from S.D.P.'s care and placing I.T.A. Jr. in the custody of MDCPS. At the shelter hearing on December 3, 2020, the youth court found that I.T.A. Jr.'s injuries resulted from a nonaccidental injury.  MDCPS made reasonable efforts to prevent I.T.A. Jr.'s removal, but S.D.P. refused to participate in G-tube training, and no suitable relatives were available with whom to place I.T.A. Jr.

¶6.     On the same day, the prosecuting attorney filed a petition for abuse in the youth court based on I.T.A. Jr.'s injury, later adding neglect.  The parents denied the allegations. MDCPS placed the child in the foster home of Sara and Nick Pendleton, a paramedic and a pulmonary nurse practitioner who have cared for medically fragile children.  The court ordered MDCPS to make reasonable efforts to reunify I.T.A. Jr. with his parents and granted them supervised visitation.

¶7.     On November 12, 2021, the youth court adjudicated I.T.A. Jr. an abused and neglected child and ordered the parents to enter service agreements to regain custody of I.T.A. Jr.  The order and service agreements required the parents to attend all of I.T.A. Jr.'s medical appointments to learn how to care for his medical conditions. The youth court determined that I.T.A. Jr.'s survival depended on his parents' preparation to provide for his numerous medical needs.

¶8.     Two years later, in May 2022, the youth court held a permanency hearing and found that MDCPS had made reasonable efforts to reunify but that the parents had substantially failed to comply.  The youth court found that the plan of reunification was no longer

3

appropriate or in I.T.A. Jr.'s best interest, so it changed the plan to adoption and a concurrent plan of durable legal custody or legal guardianship. The youth court appointed a guardian ad litem and ordered MDCPS to file a petition for termination of parental rights. At a permanency hearing in October 2022, the court found it was in I.T.A. Jr.'s best interest for the plan to remain adoption.

¶9. MDCPS filed a petition to terminate on May 26, 2022, under Mississippi Code Sections 93-15-115 and -119 (Rev. 2021). On April 11, 2023, the youth court held a third permanency hearing, finding that adoption was still in I.T.A. Jr.'s best interest. In June 2023, the youth court held a termination-of-parental-rights hearing, finding that the parents failed to comply with their court-ordered service agreements and were physically, mentally, morally, or otherwise unfit to raise I.T.A. Jr.

¶10. On June 21, 2023, the youth court entered a judgment terminating parental rights. It is from this judgment that the parents appeal, contending that the youth court's decision was not supported by clear and convincing evidence that they were unfit to raise I.T.A. Jr.

**DISCUSSION**

¶11. The Court terminated both parents' rights pursuant to Mississippi Code Section 93-15-119(1)(a), which provides:

> (1)  A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:
>
> > (a)(i) That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present

4

> conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and
>
> (ii) That termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome;[.]

Miss. Code Ann. § 93-15-119 (Rev. 2021).

¶12. Under Mississippi Code Section 93-15-115, the youth court found:

> (1) that I.T.A. Jr was adjudicated an abused and neglected child,
>
> (2) that he had been in the care of MDCPS for at least six months and a reunification plan had been developed,
>
> (3) that the youth court previously conducted a permanency hearing and found that CPS had made reasonable efforts at reunification but the parents had failed to substantially comply with the service plan, and
>
> (4) that reunification was not desirable toward obtaining a satisfactory permanency outcome based on one of the grounds listed in Section 119 or 121.

*See* Miss. Code Ann. § 93-15-115(a)-(d) (Rev. 2021).

¶13. The court specifically held that I.T.A. Jr. cannot be safely placed with either parent (1) due to the minor's medically fragile state, and (2) due to the parents' insufficient understanding and ability to properly care for the child. The court found that the service agreement requirement for the parents to attend appointments and learn how to care for I.T.A. Jr. was "imperative to the survival of this child were he to return to one of the parents." The court found by clear and convincing evidence that

> even after two and a half years of going to medical appointments, visitations, and trainings, the parents' still have an insufficient understanding of (1) what all their child suffers from medically, (2) what all their child has been

diagnosed with, (3) what medications are required for his medical issues, (4) what medications the minor is currently taking, and (5) what all is required for and how to properly care for the medically fragile minor child.

¶14. On appeal, the parents contend that the youth court's decision was not supported by clear and convincing evidence that they were unfit to raise I.T.A. Jr. They also argue the guardian ad litem's investigation and report was insufficient because the guardian ad litem did not take an active role in the trial.

¶15. This Court "giv[es] deference to the [youth court's] findings of fact." *S.F. v. Lamar Cnty. Dep't of Child Prot. Servs. by Davenport*, 373 So. 3d 985, 987 (Miss. 2023) (alterations in original) (internal quotation marks omitted) (quoting *G.Q.A. v. Harrison Cnty. Dep't of Hum. Servs.*, 771 So. 2d 331, 335 (Miss. 2000)). The [judge]'s findings of fact are viewed under the manifest error/substantial credible evidence test." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Vance v. Lincoln Cnty. Dep't of Pub. Welfare*, 582 So. 2d 414, 417 (Miss. 1991)). "This standard of review is highly deferential to the chancellor, who has the opportunity to hear all the testimony and observe the demeanor of all the witnesses firsthand." *J.C.N.F. v. Stone Cnty. Dep't of Hum. Servs.*, 996 So. 2d 762, 766 (Miss. 2008).

**I.      Whether clear and convincing evidence exists to support termination of both parents' rights.**

¶16. Both parents, the foster father, and a child protection specialist from MDCPS testified at the termination of parental rights hearing. The testimony presented at the hearing revolved around the parents' ability to care for I.T.A. Jr.'s medical needs.

6

¶17.   The guardian ad litem was present but did not testify. Her report was admitted into evidence. The guardian ad litem's report listed I.T.A. Jr.'s injuries as follows: encephalopathy, cerebral palsy, chronic lung disease, contractures, epilepsy, oropharyngeal dysphagia, eosinophilic esophagitis, G-tube dependency, subglottic stenosis, reactive airway disorder, cortical visual blindness, hearing impairment, autonomic dysfunction/dysautonomic spells, gastroparesis, and neurogenic constipation.

¶18.   I.T.A. Jr. takes approximately thirteen medications.  I.T.A. Jr. has three types of seizures that cannot be seen.  His pediatrician and neurologist have advised that his life expectancy is limited. I.T.A. Jr.'s care requires several pieces of equipment, specifically a wheelchair with activity tray, standing frame, ankle-foot orthotics, suction machine, feeding pump, IV pole, cough assist machine, feeding tube, feeding supplies, hearing aids, switch adapted toys, and a medical bed. In the future, I.T.A. Jr.  will need additional equipment including a seating system, medical car seat, Hoyer lift, bath chair, adaptive transport vehicle, and adapted bathroom.

¶19.   S.D.P. testified that initially she believed I.T.A. Jr. had the stomach bug because he did not lose consciousness and continued to exhibit normal behavior after his fall. It was not until after they arrived at the hospital that the grandmother told S.D.P. that child had also fallen off the bed and hit his head earlier that same day.  Had S.D.P. known the severity of his injuries, she testified she would have gone to the hospital in Hattiesburg. She denied driving him to Gulfport because she had a conviction for aggravated assault in Hattiesburg from 2007.

7

¶20. S.D.P. testified that she had extensive visitation with I.T.A. Jr. and believed she could provide for his needs. She had her CNA (nurse aide) license at one point in time and had received some CPR training. She testified that she should be given custody because "everybody gets second chances in life." While she cannot lift more than 150 pounds due to a spinal fusion, she indicated she had people in her life who could assist if required. Of those people included a CNA, who is in the process of receiving nurse training, and a dialysis patient. S.D.P. testified that she did not have any of the equipment currently needed for I.T.A. Jr.'s care nor was she familiar with his medications or frequency of giving his medications. She testified that she attended I.T.A. Jr.'s medical appointments and received training in the process of using a G-tube and feeding her son. She fed him during visits and helped him with his exercises that the physical therapist showed her how to do.

¶21. I.T.A. testified that he was in Mobile the day of I.T.A. Jr.'s injury and that S.D.P. had called him around 11:30 that morning saying that I.T.A. Jr. had fallen the night before and that they were headed to the hospital. He met them at the hospital immediately. He testified that the grandmother's description of how I.T.A. Jr.'s was injured varied, and he did not trust the grandmother because police told him they believe she had caused I.T.A. Jr.'s injuries. Further, he heard S.D.P. tell the police that her mother had a mental problem.

¶22. I.T.A. initially testified he did not believe S.D.P. injured I.T.A. Jr. nor did he have a problem with S.D.P. bringing I.T.A. Jr. to a hospital further away, but he later admitted issues with both. He maintained faith in her parenting skills, however.

8

¶23.    I.T.A. did not miss any visits with I.T.A. Jr., and he attended doctor visits. I.T.A. testified he knew his son was very sick and would always have seizures requiring medication, would require a wheelchair, and would require twenty-four-hour care. He fed I.T.A. Jr. through his G-tube at visitation and understood the basic process of feeding and cleaning his tube. He was unable to state the exact amount of fluid during a feeding but indicated he knew what to do although he did not know the exact terminology.  He testified that the foster mother taught him how to care for I.T.A. Jr. and that they had done a great job of caring for him.

¶24.    I.T.A. obtained CPR certification in April 2023, two months before the hearing. I.T.A. stated that he lived with his uncle in his uncle's home. I.T.A. does not have a lease or a home of his own.  He testified that his uncle and his friend who was an employee at Mobile Infirmary would help him care for I.T.A. Jr.  I.T.A. would make sure he had someone in his home to help him provide care for I.T.A. Jr.

¶25.    I.T.A. admitted that although he wanted custody of I.T.A. Jr., it would not be easy for him to assume his care because it was difficult to learn about all of his issues but that with some instruction, he could learn to do it.  He testified it would take time to learn everything involved, but he was prepared to take all necessary steps to be able to raise I.T.A. Jr.  and continue to be I.T.A. Jr.'s parent. He felt the time he had to learn was insufficient.  He did not go to I.T.A. Jr.'s daycare to watch his physical therapist or learn about his daily care. I.T.A. testified it was in I.T.A. Jr.'s best interest to remain in the care of his foster parents, but he wanted to maintain his parental rights.

¶26. Tonya Jones, a child protection specialist with MDCPS, testified about the parents' visitations with the child. She testified she made notes in the visitation log expressing concern that the parents did not fully understand the child's medical condition, the severity of his condition, or his future prognosis. The log showed that the parents had met his pediatrician, pediatric orthopedic surgeon, therapist, and the doctors treating his hearing and vision loss. According to Tonya, S.D.P. interacted more than I.T.A and, by the end she felt the parents' had obtained a better understanding of his medical conditions to an extent. She testified the parents visits had improved since she was their caseworker.

¶27. Tonya said had only seen them feed and play with him though. She did not know whether they could tell if I.T.A. Jr. was having a medical emergency. She testified that the agency wanted the parents to reunify with the child because it believed they could be taught to provide the necessary care, which the agency would provide. She was, however, unable to explain why the parents had not received the training they needed during the two and a half years the case had been pending. She said it was never brought up to the agency that the parents might need more than two hours of visitation per month. She believed the parents would have spent more time with him if given the opportunity. But, she also admitted, the parents were "not ready physically, mentally [and] medically to take the child home." And the parents also admitted to her on the day of the hearing they were not ready.

¶28. She testified that the agency supported reunifying S.D.P because she had completed the requirements of her service agreement and learned CPR. But she also admitted it would

be in I.T.A. Jr.'s best interest to remain in the care of his foster parents who have specialized knowledge and training.

¶29. The foster father testified about I.T.A. Jr.'s medical condition and daily routine of care. He testified that his wife handled most of I.T.A. Jr.'s care. I.T.A. Jr.'s day usually started around 7:00 a.m. He spent three to five days per week at a medical daycare. If he was sick or the daycare was closed, one of the foster parents had to be available to care for him. I.T.A. Jr. was fed every three hours and took medications three times per day. The foster mother was often up late at night or all night caring for I.T.A. Jr.

¶30. In their home, I.T.A. Jr. had his own room with a medical bed, refrigerator, toys, and a closet full of medical supplies. He had random seizures, which could be hard to detect because it could be as subtle as eye fluttering. The foster father testified that his wife was good at spotting seizures. If I.T.A. Jr. had multiple seizures, he must be given emergency medication. The foster father testified that his wife contacted his neurologist directly via email when she had questions or concerns. He testified it took a lot of work to keep I.T.A. Jr. from developing contractures and to maintain his quality of life.

¶31. The foster father testified that since the foster mother and he had assumed custody, I.T.A. Jr. has been hospitalized several times and had brain surgery to insert a catheter for drainage. Approximately one month prior to the termination of parental rights hearing, I.T.A. Jr. had both his hips surgically broken and reset; he was in a cast from his ankles to his chest. They anticipated he would need more procedures in the future. If I.T.A. Jr. has a bad spell

11

of seizures in the future, he will need to be hospitalized for treatment and may need additional equipment in the future.

¶32. At the conclusion of the hearing, the youth court entered a judgment terminating both parents' rights. On appeal, the parents argue that termination for unfitness should be only for cases involving "egregious acts perpetrated by parents," and their abilities should not be compared to the foster parents, who have specialized medical knowledge. The parents contend that they were unfit because of their lack of resources, not because of any egregious acts they did, so the court erred by terminating their rights.

¶33. The Court of Appeals affirmed the chancery court's termination of parental rights for parents who were unfit due to drug and alcohol addiction or criminal behavior. *A.B. v. R.V.*, 363 So. 3d 855 (Miss. Ct. App. 2019) (mother's parental rights terminated due to drug addiction and criminal activity); *J.P. v. L.S.*, 290 So. 3d 345 (Miss. Ct. App. 2019) (both parents' rights terminated due to drug addiction). Here, the parents argue, unlike the parents in those cases, their rights were terminated because they lacked resources, not because of something they did.

¶34. This Court has made clear in *Wilson v. Davis*, 181 So. 3d 991, 997 (Miss. 2016), a natural-parent-presumption case between a grandmother and a father, that a "finding must prevent probable *harm* to the child, and not simply . . . . that the third party can provide the child with different or arguably 'better' things." "[I]f demonstrable, clear and convincing evidence exists that the child will suffer probable harm and detriment in the custody of the

natural parent, the court may find that the natural parent presumption is rebutted[.]" ***Id.*** at 996.

¶35.   Here, the Court found,

> it would be an extreme injustice and probable [sic] life threatening to this minor child to remove him from the foster home where he currently resides and receives the care that is required for his survival and to place him into one of the home of the parents who not only have an insufficient understanding (1) of their child's needs and (2) how to properly care for those needs, but also, admittedly, do not have the extensive medical equipment required to properly care for this medically fragile child.

¶36.   While the lack of resources played a part in the court's decision, this was not the sole piece of evidence warranting termination of their rights. This is not about the parents' not having the medical equipment in their home yet or not having perfect medical knowledge. This is a matter of life or death for this child.

¶37.   The parents cite a medically-fragile-termination case from Maine for support.  In ***In re Child of Barni A.***, 314 A.3d 149, 154 (Me. 2024), the Supreme Judicial Court of Maine vacated the trial court's termination of the mother's rights because it found the record did not show by clear and convincing evidence that the mother was unable to care for the child with the benefit of the twenty-four-hour, seven-day-a-week care to which he was entitled.

¶38.   In Maine, a statute exists that requires child protection services to state in the reunification plan "services which must be provided or made available to assist the parent in rehabilitating and reunifying with the child." ***Id.*** (citing 22 M.R.S. § 4041(1-A)(A)(1)(c)(ii), (3) (2023)).  The Maine Supreme Court held that the child was entitled to "full-time private nursing care under federal and state law[,]" but the reunification

plan did not address the child's needs to provide the services that would help the mother be reunified with her child. *Id.*

¶39. The parents argue this case should be reversed to determine whether the parents are fit when they have the nursing care I.T.A. Jr. needs and to which I.T.A. Jr. is entitled. ***Barni*** is distinguishable for multiple reasons. First, the child in ***Barni*** was born premature with genetic abnormalities and had a prospective future. *Id.* at 152. I.T.A. Jr. was injured while in his mother's care and under questionable circumstances. Second, in ***Barni***, evidence was presented at the hearing that the child was entitled to twenty-four-hour, seven-day-a-week private nursing care by statute. Mississippi does not have a comparable statute mandating private nursing care under such circumstances. According to the November 2021 youth court order, the parents were to attend all medical appointments and to learn to care for I.T.A. Jr.'s needs. They did not do so.

¶40. Here, while the parents argue they did not commit egregious acts, as in the Court of Appeals cases they cite, they fail to acknowledge that this action began when S.D.P. delayed seeking treatment for I.T.A. Jr. despite his apparent head injury. Initially after the fall, S.D.P. exhibited a lack of concern for the welfare of her child. This injury was likely worsened by S.D.P.'s delay in getting him medical treatment. I.T.A. Jr., who was once a perfectly normal and healthy child, became a medically fragile child after a fall that occurred while in the custody and care of S.D.P., his mother. Moreover, the hospital noted that I.T.A. Jr.'s injury was inconsistent with the explanations for the fall provided by his mother or grandmother.

14

¶41. The most crucial part of the reunification plan was for the parents to attend and, more importantly, to learn to care for I.T.A. Jr. because his life depends on his caregivers. After two and a half years, both parents admitted they were not ready to assume care of I.T.A. Jr. They failed to learn the vital information required to care for their medically fragile son. While they attended all appointments and visited with the child, both parents admitted that they were not any further ahead in assuming care of him.

¶42. The Court found that the parents were given sufficient opportunity to learn how to properly care for the medical needs of this fragile child. Neither parent could state that they felt I.T.A. Jr. could safely be returned to their care at the time of trial. Both the guardian ad litem and an MDCPS specialist agreed that termination would be in I.T.A. Jr.'s best interest. As such, we affirm the finding of the youth court that clear and convincing evidence exists to support termination of both parents' parental rights.

## II. Whether the guardian ad litem's investigation and report were insufficient.

¶43. The parents argue for the first time on appeal that the guardian ad litem's investigation was insufficient. "The proper function of role of a guardian ad litem is one who 'investigates, makes recommendations to a court, or enters reports' and is 'a representative of the court appointed to assist it in properly protecting the interests of an incompetent person.'" *M.J.S.H.S. v. Yalobusha Cnty. Dep't of Hum. Servs.*, 782 So. 2d 737, (Miss. 2001) (quoting *S.N.C. v. J.R.D.*, 755 So. 2d 1077, 1082 (Miss. 2000)).

¶44. The guardian ad litem was present at the hearing, and her report was admitted into evidence. The parents did not object to the report being admitted into evidence. When

15

MDCPS chose not to put the guardian ad litem on the stand, the parents could have called the guardian ad litem as a witness and cross-examined her. They did not do so. The parents did not make any post-hearing motions objecting to the sufficiency of the guardian ad litem's investigation or report.

¶45. "Before an issue may be assigned and argued in this Court, it must first be presented to the trial court." *Wilburn v. Wilburn*, 991 So. 2d 1185, 1191 (Miss. 2008) (internal quotation marks omitted) (quoting *In re Hampton*, 919 So. 2d 949, 957 (Miss. 2006)). Because the parents did not raise any arguments as to the sufficiency of the guardian ad litem's investigation or report, this Court finds the parents have waived this argument.

## CONCLUSION

¶46. Because the youth court found by clear and convincing evidence that the parents were not mentally, morally, or otherwise fit to raise I.T.A. Jr. and that reunification was not desirable toward obtaining a satisfactory permanency outcome, we affirm.

¶47. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**